(15 Misc. Rep. 385.)

## OLNEY v. BAIRD et al.

(Supreme Court, Special Term, New York County. December, 1895.)

CORPORATIONS—INSOLVENCY—PREFERENCE.

Under Laws 1890, c. 564, § 48 (Stock Corporation Law), providing that no conveyance of property by such a corporation, or any officer thereof, nor any judgment "suffered by it or any officer" when it is insolvent, or its insolvency is imminent, with intent to give a preference, shall be valid, property of an insolvent corporation, acquired by a creditor through a judgment in another state, must be accounted for by him for the benefit of creditors in general, the secretary of the corporation having, at the expense of the creditor, gone into the other state, to enable the creditor to get service on the corporation, and papers in the suit having been left by the secretary with a lawyer whose services were paid for by the creditor.

Action by Peter B. Olney, receiver, against Matthew Baird and others. Judgment for plaintiff.

Action by receiver to recover property of the corporation acquired by defendants under a judgment recovered against such corporation.

Samuel A. Noyes and George C. Comstock, for plaintiff.
Joseph Fettretch, for defendants.

BEEKMAN, J. The Sargent Granite Company, a business corporation, duly organized and incorporated under the laws of the state of New York, having become insolvent, an action was instituted against it on behalf of certain of its judgment creditors for a sequestration of its property, and in that suit the plaintiff has been appointed receiver. No assets have come into his hands, and he now brings this action against the defendants for the purpose of recovering the property of the corporation, of which the defendant Matthew Baird claims ownership under the following state of facts: On or about April 7, 1890, the Sargent Granite Company was organized as a corporation under the general manufacturing act (Laws 1848) of the state of New York. Its capital was fixed at $20,000, represented by 200 shares, of which all but 5 were issued for property which was transferred to it. In order to obtain money with which to carry on its operations, the company borrowed from one C. F. Schramme the sum of $10,000, and for the purpose of securing him gave him a bill of sale of all its property, which bill of sale, although absolute in form, was intended by the parties to operate only as a chattel mortgage. Mr. Schramme also held about 100 shares, or one-half, of the capital stock of the company. Being desirous of severing his relations with the company, he entered into negotiations with the defendant Mat-

thew Baird, and it was finally agreed between them that Baird should take a transfer and assignment from Schramme of his stock and the indebtedness of the corporation to him upon payment of the amount of said indebtedness, which was then about $9,900. The understanding was that Mr. Baird should take the position of Mr. Schramme in the company, with all the rights, as against it, which the latter then enjoyed. This transaction was consummated about the 27th day of August, 1890, and the stock in question was transferred to Baird, and the bill of sale was also delivered to him at the same time. No formal assignment of the latter was ever executed, and, whatever view may be taken in respect to its validity in law as a chattel mortgage, it was sufficient in the hands of Mr. Schramme, and, under the arrangement between himself and Mr. Baird, also in the hands of the latter, to constitute at least a preferential equitable charge upon the assets of the corporation in favor of the holder. At that time the corporation was not insolvent, nor had it refused to pay its notes or other obligations when due. The determination of the effect of this bill of sale, however, is not within the issues of this action. The transaction was the outcome of an understanding which had been arrived at between Mr. Baird and Frank T. Sargent, who was then the president of the corporation. The understanding was that Mr. Baird should acquire Mr. Schramme's interest, as above stated; that he would also, from time to time, advance such money as might be needed for the operations of the company; that all of the products of the company should be consigned to him; that the proceeds of the sale of such products should be collected by him; and that interest on balances should be credited or allowed, as the case might be, at the rate of 6 per cent. per annum. It is claimed by Mr. Baird that, in addition to this, it was also understood and agreed that the company, for the purpose of securing his advances, would from time to time give him bills of sale of everything it had, and assignments of all moneys due it upon contracts. This, however, is denied by Mr. Sargent. I feel constrained to accept his version of the matter; among other reasons, because it seems more in accord with the probabilities of the case, as well as with the subsequent conduct of the parties. Although Mr. Baird, during a period of some 20 months after he came into the company, had made advances which brought the company into his debt to the extent of something over $100,000, no bills of sale were ever made to him, nor apparently did he request that they should be given; and subsequently, when such transfers were made in some cases under resolutions passed by the trustees reciting the reasons for their action in that regard, no reference of any kind was made to any previous understanding or agreement such as the defendant Baird claims to have existed. It is not necessary for me, therefore, to consider whether such an agreement, which it is conceded never received any formal sanction by vote of the trustees, would have been valid.

Immediately upon Mr. Baird's becoming a stockholder of the corporation, he was elected a trustee, and also treasurer. No bank account, however, was opened in the name of the company, but all of its moneys, from whatever source, were received by him, and de-

posited to his individual account.   A ledger account was kept by
him with the company, in which he charged it with the moneys which
were advanced by him, and which were from time to time paid out
to meet the current expenses of the corporation, and credited it with
the moneys collected by him on its account.   It may be said in passing
that Baird had peculiar facilities for handling the product of the com-
pany, in view of the fact that he was a contractor doing a very ex-
tensive business in this city with the different departments of the city
government, which required the use of granite either for the paving
of streets or the construction of piers and bulkheads on the water
front.   In the month of March or April, 1882, he seems to have be-
come alarmed about the financial condition of the company, and
requested Mr. Frank T. Sargent, who was still its president, to execute
to him a bill of sale of its property, to be held by him as security for
his debt.   Mr. Sargent testifies that at first he refused to do so,
claiming that it would be unfair to the other creditors; but that, upon
threat being made by Mr. Baird to wind the company up, he yielded,
and the paper was accordingly executed and delivered, and on or
about the 9th day of May, 1892, was recorded in the clerk's office
in the city of Belfast, in the state of Maine.   Mr. Baird denies that
he made any such threats.   Some three days prior to the date of this
bill of sale a special meeting of the trustees of the company was
held, at which the resignation of Mr. Baird as treasurer and trustee
was received and accepted, but no other action of any kind was taken,
nor was any authority whatsoever given to the president to make the
bill of sale in question.   The resignation of Mr. Baird was obviously
prompted by prudential motives, in view of the fact that his security
under the bill of sale would have been very much impaired, if not
entirely destroyed, by the fact of his being an officer of the company
at the time of its execution and delivery.   On the 18th day of May
following, and for the same reason, he took the further step of divest-
ing himself of all of his stock in the company, which he transferred to
one George L. Harrington.   During all the time that Mr. Baird was
connected with the company, either as stockholder or creditor, Mr.
Harrington was his superintendent in his personal business; and
when the stock was so transferred to him he was told by Baird that
he could have whatever there was of it after the indebtedness of the
company to him (Baird) had been paid, and at the same time he di-
rected him, out of the shares so transferred, to give 19 shares to Wil-
liam J. Clark, 20 shares to one William H. Keyes, and 10 shares to
one Babcock.   Clark was Baird's confidential clerk and bookkeeper,
and Keyes was a superintendent in the employ of James Baird, who
was a brother of the defendant Matthew Baird.   According to Mr.
Baird's statement, the understanding between them was that they
were to become absolute owners of the stock in question, and were
entitled to get out of it whatever might be coming to the stockholders.
No consideration of any kind passed upon the transfer, nor is it
claimed that it was anything more than an absolute gift of the stock
in question to these persons.   I shall have occasion hereafter to
refer to this transaction as somewhat persuasive evidence of a con-
viction on the part of Baird that the company was hopelessly em-
    v.37 N.Y.s.no.6—52

barrassed at the time. On the day following this transfer Mr. Harrington was elected a trustee to fill the vacancy created by Baird's resignation. At the same meeting a resolution was adopted that all moneys due or to become due the company from Mr. G. H. Mitchell, of Chicago, be assigned to the defendant Matthew Baird, and also that all moneys due or to become due from one Gallagher should also be assigned to him. On the 24th day of June, at a meeting of the trustees, a motion was made by Mr. Harrington, which was unanimously carried, "to transfer the lease of the Mount Haegen granite quarry to Matthew Baird as collateral security for money due him by the Sargent Granite Company, said lease to be transferred back to the company on their paying off said indebtedness." Again, on the 28th day of July, a further meeting of the trustees of the company was held, at which a motion was made by Mr. Harrington, which was carried, apparently without opposition, "that the president be authorized to give a bill of sale covering all stone, manufactured and unmanufactured, and any personal property not already covered by previous bill of sale, to Matthew Baird, as security for moneys advanced to the company." No other meeting seems to have been held until the 29th day of August, 1892. In the meantime, and on the 25th day of August, 1892, a meeting of the stockholders of the company was held, at which the following trustees were elected: Francis T. Sargent, W. Otis Sargent, William J. Clark, William H. Keyes, and George L. Harrington, and on the 29th day of August the trustees thus chosen met and elected George L. Harrington president of the company, and William H. Keyes vice president, and William J. Clark secretary and treasurer. At the same time a resolution was passed, which, after reciting that the Sargent Granite Company was indebted to Matthew Baird in a sum exceeding $50,000 for moneys paid by him to the company, and for its account and benefit, and that the company, for the better securing of such indebtedness, had, through its president and secretary, made and delivered to Baird the bill of sale above referred to, bearing date on the 19th day of April, 1892, ratified and confirmed the action of said officers, and declared that such paper should have the same effect as if said officers had been authorized by the board of trustees to execute and deliver the same. A further resolution was also passed, which, after reciting that since the 19th day of April, 1892, Baird had paid out large sums of money on account of the company, for which the company was still indebted to him, provided that for the better securing of the entire indebtedness the company should make, execute, and deliver to him "full and complete bills of sale of all its personal property, goods, and merchandise, wherever situated, including that described in the bill of sale aforesaid of April 19, 1892, as well as such as has come into its ownership since that date," and the president of the company was directed to execute and deliver the same to him. On the 23d day of September, 1892, the trustees again met, and a resolution was passed which recited that the company had entered into a contract with one Patrick Gallagher, and that in the performance of said contract by the company Matthew Baird had advanced and loaned moneys to said company, and also that the company was indebted to Baird in

large sums of money; and it was thereupon resolved that all moneys then due or thereafter to become due to the company under said contract should be assigned and transferred to Baird as payment on account of the indebtedness of the company to him, and the president of the company was authorized and directed to execute and deliver such an assignment. At the same meeting another preamble and resolution was also adopted, under which the lease to the company, made on the 6th day of June, 1891, of certain real estate, which will be referred to hereafter as the "Mount Haegen Quarry," was surrendered and canceled. This resolution recites that it was deemed for the best interests of the company that such action should be taken, and the treasurer of the company, Mr. Clark, was authorized and empowered to cause the necessary instrument of cancellation to be made, executed, and delivered to the lessors. A further resolution was also adopted, which recited a contract between the company and one G. H. Mitchell for furnishing him with certain granite; that in the performance of said contract by said company Matthew Baird had advanced and loaned, and was about to advance and loan, moneys to said company; and it was thereupon resolved that all moneys due or to become due under said contract should be assigned and transferred to said Baird on account and in part payment of what was then due from said company to him, and the usual direction was given to the officers of the company to carry the resolution into effect. The next and the last meeting of the board of trustees of which any record is found in the minute book was held on the 9th day of November, 1892, and the following business was transacted at that meeting: The resignation of Francis T. Sargent as trustee was presented and accepted, and one George E. Babcock was elected to fill his place. A resolution was passed under which, after reciting that numerous actions had been brought against the company, both in this state and in the state of Maine, it was resolved that Messrs. Harriman and Fessenden be retained to act for and on behalf of the company in all of said actions, with full power to act in such manner as they might deem best for the interests of the company. Two other resolutions were passed, one forbidding Francis T. Sargent, and the other forbidding Winthrop O. Sargent, from interfering or intermeddling with the business or affairs of the company.

All of the transfers seem to have been executed in conformity with these various resolutions, except that, instead of the lease of the Mt. Haegen quarry being assigned as authorized at the meeting of June 24, 1892, it was surrendered under the resolution of September 23, 1892. The motive of the company in surrendering this lease becomes apparent when we consider the action taken by Mr. Baird in the matter. On or about the 27th day of September, 1892, some four days after the meeting of the trustees at which the resolution was passed canceling the lease, Mr. Baird went to Bangor, and had an interview with Capt. Goodwin, who was one of the lessors. Frank T. Sargent was present at the time, and at that interview Mr. Baird requested Capt. Goodwin to accept the surrender of the lease, and to make out a new lease of the property, upon substantially the same terms, to him individually. There was some

objection made to this on the ground that Mr. Frank T. Sargent held an option for the purchase of the fee of the property, but this difficulty was disposed of by a cancellation of the option, and the surrender of the lease was accepted, and a new lease made to Baird in conformity with his request; the latter at the same time paying to Capt. Goodwin the rent under the old lease, which was very much in arrears, and also an additional sum representing another indebtedness of the company to him. At the same time, and apparently as an inducement to Mr. Sargent to withdraw his opposition to the transaction, a letter was then and there written to him by Mr. Baird, which he dated September 27, 1892, and which contains the following statement:

"Being about to take possession of the quarry at Mount Haegen mine, and having expended considerable moneys for tools, derricks, horses, cattle, machinery, boilers, railroads, etc., I will agree with you, if you want to work with me in the same under my direction from this date to January 1st, 1894, and if the quarry will by that date be able to earn money enough to pay up to me all the moneys with interest and expenses expended by me before this date and up to the date of January 1st, 1894, I will then agree to transfer to you one-third interest I have in the above quarry, tools, machinery, etc."

Mr. Sargent's explanation of this is that he intended to make this arrangement for the benefit of the stockholders. Whether this explanation be true or not, it is not relevant to the decision of the case. Its value is found chiefly in its bearing upon the intent of the defendant Matthew Baird in securing the lease in question in his own name.

Down to this point it will be apparent from the facts which I have stated that, commencing with the 19th day of April, 1892, and ending with the 27th day of September, 1892, the defendant Matthew Baird had acquired complete control and dominion over every asset belonging to the company; the only other property which had belonged to it being a quarry known as the "Oak Hill Quarry," which, according to Mr. Baird's statement, proving to be unprofitable, the company had virtually abandoned. During all of this time, then, the situation was this: Every dollar of money which came in on account of contracts which the company had, or on account of its products, was received by Mr. Baird, who charged himself with it in his account with the company. All products of the company were consigned to him, and were under his complete control; and all other property of the company had been placed under his dominion by the action of the trustees in sanctioning the various papers which had been executed for the purpose of vesting him with the title to the property of the company. There was no further possibility of free agency on the part of the trustees, and the corporate functions of the company were virtually in a condition of utter paralysis. The majority of the trustees were either in his employment or otherwise under his influence; and the fact that they officially existed simply for recording his will, protecting his interests, and serving his purposes abundantly appears from the fact that no business, with one or two trifling exceptions, was transacted at any of their meetings, except the diligent divesting of the corporation of its property, in order to promote his interests. Al-

though from the 16th day of April he had ceased to be a trustee of the corporation, and from the 18th day of May had also ceased to be a stockholder in the same, he stood for the company in all of the transactions which were had in the line of its business, gave directions in regard to its work, communicated instructions for the reduction of its working force, and, in short, managed and controlled its business, financially and otherwise, as if he had been an officer of the corporation vested with plenary powers to do as he pleased in the direction of its affairs. It is not difficult, in view of all this, to come to the conclusion that Mr. Baird, as far back as the month of March or April, 1892, was aware that the company was insolvent. That such insolvency existed at that time and at all times subsequent thereto is, I think, plainly apparent upon the proofs. The indebtedness of the company to Mr. Baird in April exceeded $100,000, and apparently rapidly increased from that time on until the judgment hereinafter referred to was recovered by him against the company in the supreme judicial court of Maine. Both Frank T. Sargent and Winthrop O. Sargent swear that during this period Mr. Baird stated to them that the company was insolvent. They also stated that bills had been incurred in connection with the equipment and operation of the quarries which had not been paid, and which were being demanded by the creditors, and that in some instances suits had been brought for the purpose of enforcing these claims. Some of these charges were ultimately paid by Baird, and no doubt augmented the rapidly increasing indebtedness of the company to him. According to the estimate given by the Sargents, the assets of the company during this period were worth about $55,000 or $60,000, while its indebtedness, including Baird's claim, amounted to between $125,000 and $150,000; and of this sum $10,000 or $12,000 were represented by book accounts due by the company and by arrears of rent, under the leases of both quarries, amounting to $5,000 or $6,000.

Without going into details, it is sufficient to say that the proofs taken as a whole, including the correspondence which passed between Mr. Baird and others in reference to the affairs of the corporation, satisfy my mind not only that the company was insolvent at the time these various transfers were made, but that the fact was known to the officers of the company as well as to Mr. Baird, and that the transfers in question were made in contemplation of insolvency, and with the intent to give Baird a preference over the other creditors of the corporation. Not the least significant fact tending to show what was in his mind as early as May, 1892, is the transaction by which he gave away his 99 shares— nearly one-half of the capital stock of the corporation. No explanation of this is afforded beyond his desire to divest himself of his relation as stockholder to the company. No reason is given why he should have been so benevolent to those to whom the stock was transferred; nor is there any other explanation of his act worthy of acceptance, except that he knew the stock was worthless, owing to the financial condition of the company, and that his surrender of it, for the purpose of relieving his efforts to secure himself from

a well-founded ground of attack, involved no sacrifice of anything substantial on his part. In reference to the transaction by which the company surrendered the Mt. Haegen lease, and a new lease was taken by Baird in his own name, it is fair to say that on the 8th day of September, 1892, prior to the adoption of the resolution in question by the company and the surrender of the lease pursuant thereto, Mr. Baird wrote a letter to Frank T. Sargent, in which, among other things, he says:

"In making out the lease of Mount Haegen, have Capt. Goodwin make it out to me, and I will settle up his account to date with you, and will file with the Sargent Granite Company writings. When the debt of the Sargent Granite Company is paid, I will transfer the lease over to the company. This, I think, I am entitled to receive as collateral security, with any other things the company have, to secure me for money advanced by me to said company."

While this letter shows that the purpose of the transaction was, through this means, if possible, to secure the ultimate payment of his debt, and thus in a sense not to misapply or embezzle its property, at the same time it gives emphasis to the complete and exclusive dominion which he had assumed over the property of the corporation, of which the quarry and its appurtenances substantially constituted all that was left.

About the 10th day of November, 1892, Mr. Baird determined to take actual possession of the Mt. Haegen property, and to deprive the company of whatever semblance of control over or management of its property had remained to it. He went to the quarry, accompanied by his attorney, who announced to the assembled workmen, in Mr. Baird's presence, and as his spokesman, that for all practical purposes the Sargent Granite Company had ceased to exist; that Mr. Baird had the lease of the quarry, and that from that day on the men would be in his employ, and that he would be responsible for their wages. From that time forward the business which had formerly been transacted by the Sargent Granite Company or in its name was transacted by and in the name of Matthew Baird. Shortly after this, actions were commenced against the company by other creditors, attachments were procured in the state of Maine, and the workmen, whose pay had been largely in arrears, commenced lien suits for its recovery, some 120 proceedings having been instituted for this purpose. Doubts having been expressed as to the validity of the various bills of sale and assignments which had been made by the company to him, Mr. Baird was advised for his protection to institute an action against the company to recover the amount of his debt, and this was brought about and accomplished in the following manner: At that time Mr. George F. Harriman, as a member of the firm of Harriman & Fessenden, was the attorney for both the Sargent Granite Company and Mr. Baird. Acting upon his instructions, his brother, Mr. James Harriman, an attorney residing in Belfast, in Maine, commenced an action in that state against the company in the name of Matthew Baird, and caused an attachment to be issued therein and levied upon all of the property in the state which had belonged to the company, and which had been included in the bills of sale which had been given

to Mr. Baird. It was a matter of considerable importance to the latter that personal service of process should be made upon an officer of the corporation in time to have the case heard at the January term of the supreme court of Maine. To that end Clark, the secretary of the company, was instructed by Mr. Harriman and Mr. Baird to go from the city of New York to Belfast for the purpose of having the summons in the action served upon him as an officer of the company, and Mr. Baird gave him the money for the expenses of the trip. Following the directions which had been so given, Mr. Clark went to Belfast, and immediately upon his arrival waited upon Mr. James Harriman, who was the attorney for Baird in the suit, and was informed by him that the sheriff would shortly call and make the service, which was done; and he returned to New York, and reported to Mr. George Harriman and to Mr. Baird what had taken place. Before he left Belfast, however, he placed the papers which had been served upon him in the hands of an attorney by the name of Thompson, and told him to take charge of them for the company. He had never met Thompson before, but was introduced to him upon that occasion by Mr. James Harriman. Thompson appeared in the action for the company. There was no contest, however, of the claim, and it appears that he was paid for his services by Mr. George Harriman, who in turn collected the amount from Mr. Baird. On the opening of the January term there was formal proof made by Baird before an auditor, who reported as due the full amount of the claim, but, upon the intervention of one or more creditors of the company, the court sent the report back to the auditor, who again made a report differing but little, if any, from the first. Whereupon judgment was entered on the 21st day of January, 1893, in favor of Matthew Baird and against the company for the sum of $146,618.65 and the taxable costs, amounting to $745.66. This recovery simply intensifies the conviction that during the year 1892 the company was utterly and hopelessly insolvent. On the 25th day of January, 1893, execution was issued upon the judgment, and the attached property was sold to the defendant William P. Baird for a sum not exceeding in all about $2,000. It was sold subject to the lien attachments, amounting to about $20,000, which it appears were subsequently paid off by Matthew Baird. It was also sold subject to attachments which were obtained in other suits. The proofs are silent as to what became of these other attachments. The sheriff testifies that he was indemnified upon the sale, and that he had been advised by competent counsel that the attachments were invalid. At all events, we find as the crowning act of this series of transactions between the company and Baird a sale of all of its property for a sum of money which seems absurdly inadequate, which was applied exclusively upon its indebtedness to Baird, who was the actual purchaser at the sale, and who now claims absolute title to all of the property so sold. William P. Baird is the son of Matthew Baird, and, although title to the property so sold was taken in his name, it appears, and in fact is admitted by the father, that he is the real owner of the property, and responsible for its appropriation and use.

The company, having been thus stripped of all its property, and being unable to pay any of its creditors, has passed into the hands of a receiver, and this action has been brought for the purpose of setting aside said transfers so made to Baird, compelling him and William P. Baird to deliver over to the receiver all of the property obtained by them under the execution sale, and to account for such property and the profits arising therefrom. Section 48, c. 564, Laws 1890, known as the "Stock Corporation Law," provides, among other things, in reference to such a corporation, that "no officer, director or stockholder thereof shall make any transfer or assignment of its property, or of any stock therein, to any person in contemplation of its insolvency; and every such transfer or assignment to such officer, director or other person, or in trust for them or for their benefit, shall be void." The courts have construed similar words in another statute to import not only insolvency that was imminent or that was expected to arise at some future period, but also a condition of present insolvency. Robinson v. Bank, 21 N. Y. 406; Paulding v. Steel Co., 94 N. Y. 334. In order that a cause of action may arise under this statute, two things are essential:

"There must be a transfer or assignment of property, and this must be done in contemplation of the insolvency of the corporation. Insolvency has been differently defined in different courts. By some it is said to be a condition in which the value of the assets is less than the amount of liabilities. By others it is said to be a general inability to pay obligations as they become due in the regular course of business. Many a business is at times insolvent, according to the first of these uses of the word, although it is prosperous, and no one thinks for a moment that any necessity will arise for applying its property to the payment of its liabilities by process of law. There is no necessity for the law to interpose in behalf of its creditors so long as the corporation is able to meet its obligations promptly. The use of this word, in the statute under consideration, is the latter use. Brouwer v. Harbeck, 9 N. Y. 589; People v. Gaslight Co., 3 How. Prac. (N. S.) 137. The statute is meant to apply when it becomes apparent to those assigning or transferring its property that the corporation is in the condition described in the latter of these definitions, so that the question confronts them: How are the assets of the corporation to be used, not in carrying on its business, but in meeting its obligations?" French v. Andrews, 81 Hun, 272, 30 N. Y. Supp. 796.

I do not think that upon the facts of this case there can be much doubt that the Sargent Granite Company, at the time when these preferential transfers were made, was not only insolvent, but was known to be so by its officers, and that it was in view of that condition, and in contemplation of such insolvency, within the meaning of the statute, that the transfers in question were made. But, had it not been for an amendment of the statute, a very serious question would have arisen whether the judgment recovered in the state of Maine by the defendant Matthew Baird against the corporation could have been successfully attacked. Until the passage of chapter 688 of the Laws of 1892, amending the stock corporation law, the decisions of the courts seemed uniformly to uphold acts on the part of officers of insolvent corporations which were plainly intended to facilitate the efforts of creditors to secure preferential liens by judgment. Varnum v. Hart, 119 N. Y. 101, 23 N. E. 183; French v. Andrews, 145 N. Y. 441, 40 N. E. 214. But chapter 688 of the Laws of 1892, which took effect on the 18th day of May, 1892,

amended section 48 of the stock corporation law, above referred to, so that the portion germane to the present discussion was then made to read as follows:

"No conveyance, assignment or transfer of any property of any such corporation by it or by any officer, director or stockholder thereof, nor any payment made, judgment suffered, lien created or security given by it or by any officer, director or stockholder when the corporation is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation, shall be valid. Every person receiving by means of any such prohibited act or deed any property of the corporation shall be bound to account therefor to its creditors or stockholders or other trustees."

It will thus be seen that the suffering of a judgment by an insolvent corporation, with the intent of giving a preference, is brought within the prohibition of the act, the legislature having been, doubtless, influenced in their action by reason of the decisions to which I have referred. This amendment has undergone judicial construction in the case of Milbank v. De Riesthal, 82 Hun, 537, 31 N. Y. Supp. 522. At page 544, 82 Hun, page 522, N. Y. Supp., Mr. Justice Parker, delivering the opinion of the court, says:

"The mere fact that the officers of the corporation do not oppose the creditor in his effort to get the judgment, but remain passive, is not alone sufficient to require the inference that the judgment was suffered with the intent of giving such creditor a preference. But the inference may be supported on additional evidence of an affirmative character, tending to show the existence of such a desire on the part of the officers of the corporation having knowledge of the situation. Evidence tending to prove such a desire on the part of the officers may consist of acts done or words spoken under such circumstances as manifest a wish or plan to effectuate a preference in behalf of the prosecuting creditor."

There can be no doubt of the fact that there existed the strongest kind of a desire and purpose on the part of the officers of this corporation to facilitate the defendant Matthew Baird in prosecuting his action to judgment. On his bidding, and at his expense, the secretary of the company went into the state of Maine, for the purpose of having process served upon the corporation through him. Not only this, but the secretary placed the papers in the hands of an attorney whom he had never met before, who was introduced to him by the attorney for the plaintiff, and who was ultimately paid by the latter. There could not well be a plainer case of suffering a judgment in order to give a preference than this. It has been argued by the learned counsel for the defendants in this action that, because this judgment has been duly recovered in the courts of the state of Maine, it is beyond the reach of any attack here. Precisely the same question arose in the case of McQueen v. New, 87 Hun, 206, 33 N. Y. Supp. 802, and was decided adversely to this contention. The defendant, who has profited by the opportunities of the judgment, is before the court, and can be compelled to account for all that he has obtained under it. It is not necessary that the judgment should be set aside, which, as it was recovered in a foreign tribunal, this court would have no power to do; but as the defendant has, through its agency, acquired a preference forbidden by our statutes, it is to be regarded as a means em-

ployed to accomplish a forbidden end, and the property acquired through the use of such means is, by virtue of our statute, affected with a trust in the hands of the defendant in favor of those from whom it has been unlawfully taken, and this court has abundant power to compel him to account therefor.

It follows, therefore, that there must be judgment in favor of the plaintiff against the defendants, declaring such transfers and acts, intended to give a preference to the defendant Matthew Baird, to be null and void, and requiring the defendants to account to the plaintiff for all of the property of the Sargent Granite Company acquired by them under any of said transfers, or by virtue of proceedings under the execution sale had under the Maine judgment, with costs.

Ordered accordingly.